RECORD NO. 21-1638

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

LEILA CATHERINE JOHNSON,
*Plaintiff-Appellant*,

v.

GLOBAL LANGUAGE CENTER,
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

BRIEF OF PLAINTIFF-APPELLANT

Jack Jarrett
Alan Lescht and Associates, PC
1825 K Street, NW, Suite 750
Washington, DC 20036
(202) 463-6036
jack.jarrett@leschtlaw.com

Dated: August 18, 2021          *Counsel for Appellant*

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES……………………………………………...…....iii

JUSRISDICTIONAL STATEMENT……………………………………………1

STATEMENT OF THE ISSUES……………………………………………..1

STATEMENT OF THE CASE…………………………………………………2

STATEMENT OF FACTS…………………………………………………3

    A. Factual Background…………………………………………..3

    B. District Court Proceedings…………………………………...25

SUMMARY OF ARGUMENT…………………………………………...26

STANDARD OF REVIEW…………………………………………28

ARGUMENT………………………………………………...…28

    I.     The District Court Erred In Finding That Plaintiff's August 7,
         2018 Email Was Not Protected Activity………………………..28

       A. Johnson reasonably believed she was opposing retaliation and
          discrimination by Matar in sending her August 7, 2018 email…………32

       B. A reasonable jury could find that GLC understood or should have
          understood the complaint to be opposition to Title VII retaliation and
          discrimination…………………………………………………...33

       C. Johnson's inclusion of Matar's misconduct unrelated to Title VII does
          not establish as a matter of law that the complaint was not protected….35

    II.    The District Court Erred In Finding That A Reasonable Jury
         Could Not Find That Johnson's EEO Activity Outside
         The August 7, 2018 Email Caused Her Termination…………………...36

i

A. A reasonable jury could find GLC had notice that Johnson repeatedly engaged in protected activity by filing an EEO complaint and reporting discrimination and harassment to Mitchell and Bairatchnyi……………….36

B. A reasonable jury could find that Johnson has established that GLC terminated her because of her protected activity to establish a prima facie case and to preclude summary judgment based on GLC's purported legitimate justifications……………………………………………37

  a. A reasonable jury could find that GLC's proffered justifications for Johnson's termination are pretext………………..…………………..37

    1. GLC's provision of false justifications for Johnson's termination is sufficient evidence of pretext to preclude summary judgment..…..37

    2. GLC's failure to investigate the accuracy of Johnson's report about Matar or determine if FSI was upset by Johnson's email is sufficient evidence of pretext to preclude summary judgment………………………………………………….…..39

  b. GLC's rehiring of Johnson and renewal of her contract in June 2018 do not entitle GLC to summary judgment with respect to Johnson's claim that her additional EEO activity caused her termination…………40

CONCLUSION…………………………………………………………...42

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                     **PAGE**

*Boyer-Liberto v. Fontainebleau Corp.*,

    786 F.3d 264 (4th Cir. 2015)……………………………………………31

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,

    555 U.S. 271 (2009)…………………………………………………….…31

*E.E.O.C. v. Sears Roebuck & Co.,*

    243 F.3d 846 (4th Cir. 2001)………………….……..…………………..39-40

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,

    790 F.3d 532 (4th Cir. 2015)……………………………………………..28

*Jacobs v. N.C. Admin. Off. of the Cts.*,

    780 F.3d 562 (4th Cir. 2015)…………………………..……………..28, 39

*McCallum v. Archstone Cmtys. LLC*,

    No. JFM-12-01529, 2013 U.S. Dist. LEXIS 142339

    (D. Md. Oct. 2, 2013)……………………………………………………39

*McNair v. Computer Data Sys., Inc.*

    172 F.3d 863 (4th Cir. 1999)………………………………......……..29

*Okoli v. City of Balt.*,

    648 F.3d 216, 224 (4th Cir. 2011)………………………….....30, 35-36

*Reeves v. Sanderson Plumbing Prods.*

    530 U.S. 133, 147 (2000)…………………………………………….…37

*Ross v. Commc'ns Satellite Corp.*,

    759 F.2d 355, 356 (4th Cir. 1985)………………………….....……..30

*Peters v. Jenney*,

    327 F.3d 307, 320-21 (4th Cir. 2003)…………………………….…...29

*Strothers v. City of Laurel*,

895 F.3d 317 (4th Cir. 2018)……………………………..…………..29-30

**STATUTES**

28 U.S.C. § 1291……………………………………………………...1

28 U.S.C. § 1331……………………………………………………...1

42 U.S.C. § 2000……………………………………………………...1

iv

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331, as the case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, as this case is appealed from a final decision of the district court. On April 27, 2021, the district court issued a decision granting defendant Global Language Center ("GLC") summary judgment. *See* Joint Appendix ("JA") at 10. Plaintiff Leila Johnson timely filed a notice of appeal on May 27, 2021, within the time allotted by Fed. R. App. P. 4. JA 10.

## STATEMENT OF THE ISSUES

Plaintiff alleges that defendant GLC violated Title VII of the Civil Rights Act of 1964 ("Title VII") by terminating her employment based on her EEO activity. The question presented on appeal is:

1. Whether the district court erred in finding that no reasonable jury could find that plaintiff's email that defendant learned of the morning of plaintiff's termination was protected activity within the meaning of Title VII.

2. Whether the district court erred in finding that no reasonable jury could find that defendant terminated plaintiff because of her Title VII protected activity.

1

# STATEMENT OF THE CASE

Plaintiff Leila Johnson worked as a federal contractor for GLC as a Language Instructor for the Department of State's Foreign Service Institute ("FSI") two separate times.  JA 445, 448.  Johnson's first period of employment ended after Johnson complained of sexual harassment, discrimination, and retaliation by FSI government employees, when FSI's contract officer requested that GLC remove her from the FSI contract and GLC terminated her employment.  JA 448.  Upon learning of this, senior FSI management requested that Johnson be rehired and GLC contacted her to rehire her.  JA 448.  Approximately one year later, GLC, with knowledge of Johnson's ongoing EEO case, fired her for sending an email to FSI senior management requesting that one of the FSI employees that discriminated and retaliated against her not be made her supervisor.  JA 449.

GLC moved for summary judgment arguing that Johnson's email was not EEO-protected activity and that their termination was based on GLC leadership's determination that the email was inappropriate.  JA 74-83.

The district court granted GLC summary judgment, finding that the email that GLC claimed was the basis for Johnson's termination was not protected by Title VII.  JA 1049-1050.  The district court also found that there was insufficient evidence for a reasonable jury to find that Johnson's other Title VII activity caused her termination.  JA 1053-54.

# STATEMENT OF FACTS

## A.    Factual Background

In February 2016, GLC hired Johnson to work as a Language Instructor in the Arabic Section at the Department of State's Foreign Service Institute ("FSI"). JA 445.   FSI's language instruction workforce includes both contractors and "direct hire," government employees.  JA 445.  From February 2016 until May 2017, Johnson did not have any GLC supervisors on-site at FSI.  JA 445.  Instead, Johnson was supervised exclusively by FSI employees called Government Technical Monitors ("GTM") and Language Training Supervisors ("LTS").  JA 445.

Throughout Johnson's two periods of employment with GLC, FSI controlled significant aspects of her employment.  FSI made the decision to hire Johnson as a contractor through GLC, FSI instituted policies that governed Johnson's employment, FSI had the power to remove Johnson from employment on the contract, FSI directed Johnson's day-to-day activities, made Johnson's schedule, provided training, provided feedback and teaching materials, and approved leave (along with GLC), and FSI evaluated Johnson's performance.  JA 471-472, 483, 490.

*Johnson performed well as a language instructor.*

3

By all accounts, Johnson performed well as a language instructor. JA 446, 501, 506.

*Johnson experienced sexual harassment and assault*

During Johnson's first period of employment, direct-hire language instructor Adlan Abdelaziz began making inappropriate sexual comments to Johnson and telling her inappropriate details about an affair he claimed to be having with a GTM, Roula Hickman. JA 446. Johnson complained to direct-hire GTM Tanya Matar about Abdelaziz's inappropriate comments to her and his statements about his relationship with Hickman. JA 446. Rather than report the harassment, Matar told Hickman who repeatedly interrogated Johnson about her relationship with Abdelaziz. JA 446, 511-519. Hickman then began harassing Johnson, insulting her, implying that she was promiscuous, that she had sexual relationships with students, and sought attention from men. JA 446-447.

In June 2016, Abdelaziz attempted to kiss Johnson and when she dodged him, he bit her shoulder. JA 447. Johnson told Matar about Abdelaziz attempting to kiss and biting her. JA 447. Again, despite her obligation as a supervisor to report sexual harassment herself, Matar told Johnson not to report his conduct. JA 447. Instead, Matar ticked through the supervisors to whom Johnson could report the harassment and told Johnson that each would terminate her. JA 447. When Johnson insisted she would report the conduct, Matar ended what Johnson had

4

thought was a friendship and excluded Johnson from work events.  JA 447.  One of

Johnson's coworkers, Nadla Chadli, told her that both Hickman and Matar had

often been referring to Johnson in derogatory terms.  JA 447, 516-518.

> *Johnson reported harassment and discrimination to SLS Dean Wanda*
> *Nesbitt pursuant to Dean Nesbitt's Open Door Policy*

In March 2017, SLS Dean Wanda Nesbitt sent an email stating that she had

an "open door," policy in which Nesbitt set aside an hour a week during which

employees could meet with her to voice concerns.  JA 447, 524-526. Pursuant to

this policy, in April 2017 Johnson met with Nesbitt and told her about the

discrimination, harassment, and retaliation she had experienced.  JA 447.   Nesbitt

told Johnson to speak with her Division Director Ann Keller-Lally.  JA 447.

Johnson met with Keller-Lally and described Hickman's harassment of her.

JA 540, 545.  Keller-Lally asked if Johnson had asked Hickman to stop harassing

her.  JA 542-544.  Johnson responded that she had done so verbally but would try

to do so in writing.  JA 542-544.  Johnson stated that if things did not improve, she

would ask Keller-Lally to address the issue.  JA 542-544.  On April 25, 2017,

Johnson sent Hickman an email asking Hickman to treat her professionally.  JA

548-549.  On May 2, 2017, during a town hall meeting of all instructors of FSI's

Arabic Section, Johnson spoke out generally against sexual harassment in the

Arabic Section.   JA 448.

> *Hickman reported the email and claimed Johnson was creating a hostile*

*work environment*

Despite the complete professionalism of the email, on May 4, 2017,

Hickman sent the email to FSI Contract Officer Jonathan Elsasser and claimed that

Johnson was creating a hostile work environment. JA 551-554. Elsasser

forwarded the information to the State Department's S/OCR (Office of Civil

Rights) for investigation. JA 551-554. On May 17, 2017, S/OCR contacted

Elsasser and stated that based upon a review of a statement drafted by Hickman,

> "there does not appear to be any nexus to the protected EEO bases,
> and thus, there is no jurisdiction for S/OCR to pursue this matter
> further. This behavior is akin bullying and should be addressed by
> leadership as a conduct issue. Thus, S/OCR will not take any
> additional action and will consider the matter closed, once Shari
> obtains the signed statement from the **alleged** victim."

JA 556-558 (emphasis added). Elsasser claims to have interpreted this email

to be a determination by S/OCR that Johnson had engaged in bullying. JA 560-

567. Elsasser emailed GLC VP David Mitchell and requested that Johnson be

removed from the contract. JA 569-572.

*Johnson informed GLC's President that she had been discriminated against
and harassed*

Mitchell contacted Johnson and told her that the State Department had

requested her removal from the contract and that her GLC employment was

terminated. JA 448. Johnson and GLC President Eugenia Nesterenko met in the

lobby of Mitchell's apartment building so that Johnson could return her access

badge. JA 448. During this meeting, Johnson told Nesterneko that she believed she was the victim of sexual harassment and retaliation during her employment with GLC and FSI. JA 448. Later that day, Mitchell emailed Elsasser and warned that Johnson might attempt to contact "the Dean or her LTS from the Visitor's Center." JA 569-572.

Meanwhile, when FSI managers Keller-Lally and Nesbitt learned of Johnson's termination, they exchanged emails in which they indicated they believed the termination was retaliatory. JA 574-575. Nesbitt and Keller-Lally called a meeting with Elsasser to discuss Johnson's termination. JA 577-580.

*GLC learned Johnson filed an EEO complaint alleging harassment and discrimination*

On June 20, 2017, GLC VP Mitchell sent himself an email documenting a call he received from an EEO investigator concerning Johnson. JA 582-583. The investigator told Mitchell that Johnson had filed a complaint alleging harassment over a one-year period and discrimination with respect to her termination. JA 582-583. Mitchell indicated that if FSI requested Johnson back that GLC would accommodate them. JA 582-583. Mitchell noted that the investigator had the power to interview "any and all parties within the State Department involved with this matter and to attempt to negotiate a mutually agreeable solution for all involved. I was left with the impression that she will definitely do so." JA 470.

For its part, though, GLC never investigated the accuracy of the bullying

7

allegations against Johnson.  JA 470.

*FSI requested Johnson's return and GLC rehired Johnson*

On July 20, 2017, Elsasser emailed Mitchell a list of FSI's preferred language instructor contractors that listed Johnson as the only preferred Arabic instructor.  JA 589-596.  Likely because she was the only preferred instructor, Johnson was solicited by multiple potential contractors that wanted to propose her to fill the opening.  JA 448.  Since GLC offered more money than the other contractor, Johnson elected to permit GLC to propose her hiring to FSI.  JA 448. On August 13, 2017, Johnson agreed to accept employment at FSI with GLC.  JA 598.

*Johnson emailed GLC leadership and indicated that she had an ongoing EEO matter with Roula Hickman and stated that she had a relationship with the Dean.*

The day before her second tenure with GLC / FSI began, Johnson emailed Iouri Bairatchnyi, a newly hired GLC program manager responsible for the FSI contract, GLC VP Mitchell, and GLC President Eugenia Nesterenko.  JA 602-603. In the email, Johnson requested that they not discuss anything about her with Ms. Hickman for reasons that she could not disclose, however, that once she received "clearance from OCR, EEO and my lawyers to disclose anything, I will tell you right away."  JA 602-603.   Johnson's email also noted that "she was on very good terms with the dean."  JA 602-603.  Johnson later met with Bairatchnyi and

explained the discrimination and sexual harassment that she had experienced during her prior period of employment. JA 449. Johnson told Bairatchnyi that she had an ongoing EEO case. JA 449.

*GLC's program manager position*

GLC's second employment of Johnson coincided with a new contract with FSI. JA 612. Under the new contract, FSI was permitted to employ a program manager at FSI. JA 483. The program manager did not direct language instructors' day-to-day performance as that role continued to be filled by government supervisors. JA 483. Instead, Bairatchnyi's duties were to receive feedback from the government supervisors about instructors, approve leave on behalf of GLC, and ensure GLC employees properly tracked their time. JA 483-486. Bairatchnyi testified that as program manager he was required to know the policies of FSI. JA 487.

*Johnson continued to perform well*

Bairatchnyi reported that Johnson's supervisors thought that her performance was excellent and highly praised her during her second period of employment. JA 485.

*FSI announced that there was EEO reprisal and sexual harassment at FSI*

During Johnson's second employment at FSI, FSI was ordered to post a finding that a supervisor at FSI had engaged in EEO reprisal. JA 1004. Also,

9

during Johnson's second period of employment, an article in a State Department magazine detailed allegations of sexual harassment by a supervisor in the Arabic Section.  JA 1006-1036.

*Contracting Officer Elsasser criticized GLC for rehiring Johnson in November 2017*

On November 17, 2017, Contracting Officer Jonathan Elsasser emailed GLC and demanded an explanation for its re-hiring of Johnson.  JA 681-683.  Mitchell responded that Johnson was listed on the preferred list but Elsasser repeated his criticism of GLC.  JA 681-683.

*Johnson's entrance badge stopped working and she asked Mitchell and Bairatchnyi if she should report the incident to her attorneys*

In February 2017, Johnson's access badge stopped working.  Fearing that she had been wrongfully reported for misconduct again, Johnson asked Mitchell, copying Bairatchnyi, if she should report the event to her lawyer.  JA 685-692. Johnson mentioned that she had hired attorneys regarding what happened the prior year and noted that she was concerned.  JA 685-692.  The next day, Mitchell documented alleged untruthful answers from Johnson in an email with the subject line "Administrative."  JA 694.

*In June 2018, Johnson requested a month of leave to visit Lebanon and FSI and GLC approved her request*

On June 4, 2018, Johnson copied Bairatchnyi on an email to her GTM Danusia Libby to obtain their permission to take leave for the month of July.

10

Johnson stated, *inter alia*:

> "Since I am traveling with my kids, and it is expensive, I do not want
> to go for a short time. The kids have not been there for four years.
>
> As you know, I had a family loss this year, and I need to go be there
> with my family. Also my grandmother was hospitalized this week,
> her health is deteriorating."

JA 696-699. Bairatchnyi and Libby approved Johnson's leave from June 29 until

August 2, with Libby noting that the "leave will not be detrimental for the section's

needs." JA 696-699.

> *Johnson had difficulty entering her leave in GLC's timekeeping system and*
> *Bairatchnyi agreed to complete it*

On June 27, Johnson was unable to enter the leave in GLC's timekeeping

program, ADP. JA 701. As she had been having difficulties with ADP, she

contacted Mitchell who emailed Bairatchnyi asked that he assist her. JA 701.

Johnson continued to have issues accessing ADP the following day. JA 703-713.

On June 29, Johnson stated that she was able to enter her leave request. JA

715. But Bairatchnyi emailed Johnson and said that because she did not have

sufficient paid time off ("PTO") to cover the leave that she needed to request PTO

and then send an email requesting LWOP for family reasons. JA 715. When

Johnson again had difficulty accessing ADP, Bairatchnyi told Johnson that he

would take care of entering her leave request and that she should just go on the

11

trip.  JA 721-722.[1]

*FSI and GLC renewed Johnson's contract for another year*

On June 29, Mitchell emailed Johnson to inform her that her contract would be renewed for another year.  JA 727.

*Mitchell questioned Bairatchnyi about Johnson's ADP entries*

On July 25, Mitchell questioned Bairatchnyi about Johnson's ADP entry for the leave.  JA 725.  Bairatchnyi claimed that after Johnson had submitted a PTO request without sufficient hours, he canceled the request.  JA 729-731.  Bairatchnyi then falsely claimed that Johnson had promised to submit an additional request over the weekend and did not, failing to mention that he had agreed to take care of the request because of Johnson's issues with ADP.  JA 729-731.

In any event, Bairatchnyi noted that Johnson had the required approval and stated that he would counsel Johnson upon her return to make sure a similar issue did not happen again.  JA 729-731.

*Johnson reported fear of harassment and retaliation by Tanya Matar to Nesbitt, Keller-Lally, and Deputy Division Director Petrosian*

Upon returning from her trip to Lebanon, Johnson learned that her FSI supervisor Danusia Libby had left the Arabic Section.  JA 449.  This temporarily

---

[1] Johnson's testimony on this point is supported by a later email from Mitchell.  On July 25, Mitchell emailed Bairatchnyi stating that it "appeared," that Johnson's July 2, 2018 PTO had been entered for her by Bairatchnyi.  JA 725.

left Johnson without a supervisor between her and Division Director Keller-Lally

(as Deputy Director Petrosian did not deal with supervisory issues). JA 449.

At the same time, several colleagues told Johnson that Tanya Matar was

likely to be assigned to be the new GTM. JA 449. In Johnson's prior employment

Matar had repeated information to Roula Hickman leading Hickman to harass

Johnson, had herself harassed Johnson by making derogatory comments about

Johnson in front of their colleagues, and had excluded Johnson from work events

and stopped speaking with her after Johnson disagreed with her about the need to

report Abdelaziz. JA 449.

On August 7, 2018, Johnson emailed Nesbitt, Keller-Lally, and Deputy

Division Director Garegin Petrosian about her concern. JA 733-735. Johnson

stated:

> Good Morning
>
> Hope this email finds you well. I was away for a while on a great
> vacation, but it's good to be back. I miss being in the classroom with
> my students.
>
> I have heard a rumor that Ms. Tanya Matar is a candidate to replace
> one of our supervisors in the Arabic Department. Unfortunately, I feel
> compelled to put it on the record that I can not work under her
> supervision **in good conscience**, knowing what I know.
>
> I am compelled to inform you of highly unethical and unprofessional
> behavior on Ms. Matar's part. **After that, the ball is in your court**,
> but please understand that I fear retaliation, and I have had enough of
> emotional strain, I can no longer go home feeling like I did for the
> past two years.

**<u>My colleagues and I have been victims of continuous harassment, both sexual and emotional</u>**. We held a focus group in which we specifically asked to not have an Arabic Supervisor in the Arabic section back in June. I went to Mr. Petrosian right before I left on my vacation, expressing concern that Ms. Matar might be eligible to switch to this department and shared information with him about her behavior.

While I know that Ms. Matar has been working hard on preserving a professional image of herself, I will go ahead and tell you of what is underneath that image.

- Ms. Matar referred to her head of division, Dr. Red back then, as an "A word" (documented in a text message). She referred to one of my supervisors, Mr. Nazir, as an "A Word" (documented in a text message). At that time, I was newly employed, and I needed to trust my leadership. She referred to most of the female leadership as "Wh word" – for example Roula Hickman and Moungia (can't remember last name), claiming they slept their way up.

- Roula Hickman and Tanya Matar were not on talking terms at the time I met Ms. Matar. She claimed that Ms. Hickman sent her an email asking her not to bother her while she worked because she loses her focus. Tanya flipped out because Roula had something "documented" on her - which was always Tanya's fear, documentation.

- When I went to Ms. Matar after my incident of sexual assault, her being a supervisor, she advised me NOT to report it to anyone or I would get fired. She then used this incident to extract information from the involved parties.

- When I informed Ms. Tanya that Mr. Adlan was making advances on me, she went and told Roula (while still claiming they did not talk). This caused Roula (who Adlan claimed to have a 9-year affair with) to start harassing me around the department. You know the rest of that story; eventually I was sexually assaulted and emotionally harassed. I tried to address both forms of harassment and got myself fired because of it. However, to stay on point, it was Tanya, my

14

supposed friend back then, who told Roula of Adlan's pursuit, which put us all under insurmountable stress, eventually getting me into doctor's offices, CAT scan, MRI testing before I was released from my job, due to stress.

- She claimed to have awarded her subordinates when she was back in ALERT to keep them "loyal". She said that Zouheira (last name?) is her "Gossip Girl" - It is not accidental that ALL of her employees this year got awards while none of Martin's did and only direct hires on Danusia's team did. Ms. Matar has professionally manipulated and abused the award system. It no longer reflect ethics and hard work. The awarding system in this department is arbitrary, and alone is an issue of it's own.

- She flirted with one of the students under her supervision back in ALERT (documented in a text message) whose wife, Stacy, was our student in the Arabic Department. Stacy suffered emotionally, and I informed Ms. Matar (all documented) that the wife is suffering because Ms. Matar was overtly, and purposefully flirting with the husband. I asked her to stop it and to be kind because the lady was becoming visually a wreck. I told Ms. Matar that although she is single, there are a lot of "fish in the sea." I asked her to join a dating app; after all, I met my husband in that manner. She continued to mess with Stacy's head. **If you need evidence, you can reach out to the student herself**, who did not file an official complaint but complained about what was happening to us. Ms Matar referred to Ms. Stacy often as a **B•••• -** She often would counteract my proposals to tone things down with a phrase " I want to Eff with them".

- She coached a contractor, Souraya (last name?), on her upcoming interview to become a direct hire by giving her the questions ahead of time. I know this because she told me ahead of time, and indeed, Souraya became a Training Specialist.

She informed me that she was on a panel that decides who gets hired. She would also tell me who applied for the job, and who she will definitely not consider. She mocked several people in the department often, informing me of the numerous times they applied for jobs, and how they were turned down. I can not emphasize how much she looks down on her subordinates and her colleagues, and definitely I can not

stress how many of them she dislikes. All of them are in the Arabic Department today, with the exception of Atef Nazir, whom she hates with ferver. She only respects Dr. Walid, and says that he supports her and knows that everyone else is "jealous" of her.

- She would tell me the personal information of students that she was interested in - information which I should not have had access to, such as their age, history, postings, and so on. I remember that she showed me the information of one Christopher Clark among others. Disturbing information, and misinterpretation of male students behaviors in the department. (**Some is documented by text**)

**If you want, I have documented records that I can share with you. I hope that this is sufficient to make you reconsider her for this position in our department.** She displays bias, prejudice, and favoritism in a professional setting. She plays the victim card to get on people's good side but then will turn against them with silent hatred and vengeance.

When I started out, I took Tanya into my home, introduced her to my family, and met with her socially outside of work. Today, Ms. Matar does not talk to me at all. The last time she spoke to me was December 2016. She excludes me from conversations and ignores my presence entirely. I am not complaining, per se, but that dynamic would be difficult to work with if she becomes our supervisor.

I would like to ask the department to further reevaluate the training process for one to become a supervisor. This is not just a matter of worry that a person like Ms. Matar could become a supervisor here, for us. It is a worry that someone like Ms. Matar can still be a supervisor at all. We are good people, we work really hard, many of us love what they do, we deserve better. Knowing that I shared with you  10 percent of what I know. The rest I need to keep to myself, because it is uglier, and darker.

Intertwined relations and personal connections have played a long and strong hand so far in our NEA world, is it at all possible to review and re-administer professionalism via intensive workshops for the supervisors in this department?

16

> **In the end, I trust that you have our best interest, and the best interest of the students at heart. The department counts on your judgment and follows your lead.**

JA 733-735 (emphasis added).

> The next day, Nesbitt responded to Johnson and stated

> Hello Leyla - **I appreciate your desire to have me be aware of so much information and I recognize that it reflects trust in my judgment**. Some of the concerns you raise should be shared with your Program Manager (PM) and I would encourage you to do that if you haven't already done so.

> SLS does not allow direct hire or contract instructors to choose their supervisor. Ann and Garegin have a process for assigning instructors to an LTS. I trust their judgment and hope you will respect whatever decision they eventually make.

JA 737-739 (emphasis added). Johnson responded again on August 9, this time copying Bairatchnyi to make him aware of the issues as Nesbitt suggested, and stated:

> Good Morning,

> I did not report this to my PM. I will report it based on your advice, Mr. Iouri as of now is CC'd on this email.

> I sent an email with what I knew and thought crucial information to the department's leadership My desire was not to spread fiction, that is why I kept it to documented material only.

> I did not wish my email to read that I was choosing my GTM (Supervisor), in fact I am not. I do not have someone in mind that I want for Supervisory.

> SLS held a group focus to ask for our input in leadership characteristics back in June, and I am very grateful for SLS giving us

17

that chance.

My email was about misconduct, among other things, that I felt compelled to report. Of course I will respect what Ms. Ann and Mr. Garegin will assign to supervisory.

Again, I thought this was detrimental information. I apologize if I have done something that I should not have done.

Thank you for your response,

JA 741-744.

*GLC terminated Johnson's employment*

Later on the morning of August 9, Mitchell emailed FSI Contracting Officer Representative Monica Sanchez and stated that GLC decided to terminate Johnson's employment. JA 746. At the time GLC decided to terminate Johnson's employment, it had not received any complaints from or communicated with Nesbitt or Keller-Lally about Johnson's email and had not investigated the accuracy of Johnson's claims in the email. JA 748-792, 794-806, 808-819.

Nesbitt testified that she did not want Johnson terminated because of her email and that Johnson was an "excellent instructor and highly regarded by her students." JA 802-803. Keller-Lally testified that she also did not want Johnson terminated because of her email. JA 816. Petrosian said the same. JA 825.

*Nesbitt and Keller-Lally testified that they were told that GLC terminated Johnson for failing to follow chain of command*

Keller-Lally testified that "Monica [Sanchez] clarified that Global Language

18

Center had said that they had informed their employees not to communicate concerns with the senior leadership of the School of Language Studies."). JA 816. Likewise, Nesbitt testified that she "was told that [Johnson] was terminated because she violated her company's policy by sending an email directly to me instead of working through her chain of command.  I was also told that the incident with me was not the first one and that Leila had previously been counseled on the issue."  JA 797.

> *GLC provided the EEO false, unverified, or mischaracterized explanations for terminating Johnson*

In April 2019, GLC provided an EEO investigator its explanation for firing Johnson.  JA 777.  Several of these explanations were outright false, several were mischaracterized, and others GLC lacked information to truthfully assert:

a.  <u>GLC falsely told an EEO investigator and that Johnson had bypassed GLC and FSI's "chain of command" and violated GLC instructions to only bring issues to the GLC program manager and not FSI staff or management</u>

One of the justifications GLC gave for firing Johnson was that she had bypassed GLC and FSI chain of command and violated GLC instructions to bring issues to the GLC program manager and not FSI staff or management.  JA 777. During the 30(b)(6) deposition of GLC and during Bairatchnyi's personal deposition, GLC claimed that GLC provided documents to contractors instructing them that they had to raise issues with their program manager first.  JA 466-468.

19

GLC claimed that a document called First Days at FSI made "explicit," that

Johnson had to follow her chain of command and that the SLS Guide for Language

and Culture Instructions also directed Johnson to follow the chain of command. JA

487.  This prohibition included communications about discrimination or sexual

harassment.  JA 487.

However, GLC has produced no documents that state that its employees had

to follow chain of command or could not communicate directly with SLS

leadership.    In fact, the documents GLC provided its instructors explicitly provide

that they could could contact SLS.  JA 833-979, 981-987.   The discrimination and

harassment policies contained in the SLS Guide for Language Culture Instructors

directs employees to "**[c]onsult your Language Training Supervisor, Division**

**Director, SLS Dean, or the Executive Director if you believe you have been**

**subjected to harassment or discrimination in the workplace**." JA 880.

(emphasis added).[2]  And, in contrast with GLC's claims that it directed its

employees to first raise issues within GLC, GLC's Orientation document regarding

employees' first days at SLS provides that an employee's FSI-employed LTS is

_____

[2] At deposition, GLC admitted that FSI's discrimination and harassment policies
applied to GLC's employees.  JA 476.  GLC also admitted that GLC had to adhere
to all State Department policies and procedures and that FSI's policies governed in
the event of a conflict.  JA 454, 475.  GLC stated that it provided Johnson its "First
Days," orientation document and the SLS Guide for Language instructors during
both period of her employment.  JA 467.

20

their "boss," and "**first point of contact regarding work performance and conduct**."  JA 982, 985.

The falsity of GLC's claims regarding chain of command and directives to only raise issues with program managers is further demonstrated by the fact that GLC knew about Johnson's relationship with Nesbitt through Johnson's August 22, 2017 email stating that they were on very good terms.  When they received this email, Mitchell and Bairatchnyi did not respond and inform Johnson that the relationship violated any policy or direct her to not communicate with the Dean.  JA 495-496, 602-603, 608.  Further, in his role as program manager at FSI, Bairatchnyi should have been aware of Dean Nesbitt's Open Door Policy and emails stating that discrimination, harassment, and bullying could be reported up the supervisory chain.  JA 525-526, 989-995.

b. GLC provided an EEO investigator false information that Johnson caused GLC financial damages through unapproved absences.

Another reason GLC claimed it terminated Johnson was because she caused GLC financial damages through unapproved absences.  JA 777.  This claim is false as GLC had approved Johnson's request to take PTO and leave without pay ("LWOP") (regardless of whether Bairatchnyi told Johnson he would enter her leave request due to her difficulties with ADP, he knew the reasons for her leave and the portion that would be covered by PTO and LWOP).  JA 492-493.

Whether or not Johnson properly took all steps to request the leave did not

21

cause GLC lost revenue or profits because GLC is not paid by FSI when a

contractor is on either PTO or LWOP.  JA 464-465.  In either case GLC receives

no pay for the contractor's time.  JA 464-465.

    c. <u>GLC falsely claimed that Johnson refused to comply with any decision to place her under Matar</u>

Another justification GLC provided the EEO investigator for Johnson's

termination was that Johnson had refused to comply with any FSI decision to place

her under Tanya Matar's supervision.  JA 777.  However, by the time GLC knew

of the emails, Johnson had explicitly stated that "I did not wish my email to read

that I was choosing my GTM (Supervisor), in fact I am not."  JA 741-744.

Johnson's original August 7 email also explicitly stated that while Johnson felt by

compelled by her conscience to report Matar's misconduct, "[a]fter that, the ball is

in your court," and that she trusted the judgement of SLS's leadership team.  JA

741-744.

    d. <u>GLC falsely claimed that Johnson's conduct damaged GLC's reputation with FSI</u>

Another reason GLC told the EEO investigator that it fired Johnson was that

her conduct "damaged GLC's reputation at FSI," through her email to Nesbitt and

her unapproved absences.  JA 777.  In fact, however, GLC did not communicate

with the FSI recipients of Johnson's August 7 email to determine their opinion of

the email and Nesbitt, Keller-Lally, and Petrosian all stated that they did not want

Johnson fired.  JA 458, 816, 825.  Further, Nesbitt had responded to the email and said that she appreciated Johnson's desire to inform her of the information and that it reflected Johnson's trust in Nesbitt's judgment.  JA 737-739.  Nesbitt did not state that she thought the email was unprofessional.  JA 737-739.

GLC's reputation with FSI with respect to Johnson's alleged unapproved absence could not have been damaged because Johnson had FSI's approval and FSI had no reason to know whether Johnson's alleged failure to send a follow-up email repeating her need for leave occurred or violated GLC policy. JA 462-463.

e. A reasonable jury could find that GLC did not believe Johnson had excessive unexcused absences or failed to follow leave requesting procedures.

GLC told the EEO investigator that one reason it fired Johnson was that she had excessive unexcused absences and that she had failed to follow GLC policies for requesting time off.  JA 777.  However, emails indicate, and Johnson testified, that she had received approval from both GLC and FSI for the leave and that Bairatchnyi told her that her request was approved and not to worry about her difficulties accessing ADP.  JA 696-699, 721-722.  Even if Johnson misunderstood that she had Bairatchnyi's approval, her mistake was at-most a technical violation of the policy by failing to send a follow-up email because she had previously provided the reason for the leave and been approved.  JA 696-699.  Emails indicate that GLC did not plan to discipline Johnson and only counsel on requesting leave

prior to her August 7 email.  JA 729-731.

      f. <u>A reasonable jury could find that GLC did not believe Johnson misled GLC in her June 4 leave request</u>

GLC told the EEO investigator that Johnson misled GLC in her June 4, 2018 email which it realized when her August 7 email to Nesbitt stated that she had just returned from a "vacation."  JA 777.  However, GLC did not speak with Johnson or conduct any investigation as to whether Johnson took the leave for the reasons she explained to GLC and used the term "vacation," to avoid bothering Nesbitt with the actual reasons for her leave.  JA 465.  Regardless, Johnson's June 4 request did not indicate that her trip was an emergency to care for her ill family members as she requested leave approximately a month early, noted that her family had a death the previous year, and stated that she was taking her kids with her.  JA 696-699.

      g. <u>A reasonable jury could find that GLC did not believe Johnson displayed a total disregard for GLC's or FSI's standards of conduct</u>

Another reason GLC told the EEO investigator that it fired Johnson was because she had displayed "a total disregard," for GLC and FSI standards of conduct.  JA 777.  However, GLC admits that the email that GLC states was the catalyst for Johnson's termination was not an inappropriate email had it been sent through the proper chain of command.  Ex. 3, 30(b)(6) Dep. at 107:19-20 "**Would it have been an inappropriate email.  No, it was a cry for help**.").  As explained

24

above, Johnson did not violate the chain of command or instructions not to contact SLS leadership because it was appropriate for Johnson to report discriminatory harassment and retaliation to Nesbitt, Keller-Lally, and Petrosian.  JA 880.

And, although GLC claims that the email was inappropriate because it contained unsubstantiated information, GLC admits that it did no investigation concerning the accuracy of Johnson's contentions regarding Matar. JA 470.  In truth, Johnson limited the email to information for which she had first-hand knowledge which she could have explained had GLC bothered to contact her.  JA 449.

*GLC provided EEOC false explanations for Johnson's termination and in depositions and its motion to dismiss in this matter*

On January 30, 2020, GLC provided the EEOC the same false or unbelievable justifications for Johnson's termination minus the claim that Johnson's unapproved leave caused GLC financial damages.  JA 1001.  Likewise, in its 30(b)(6) deposition, GLC testified that the final listing of reasons for the termination was why it claimed it fired Johnson.  JA 455.  In its motion to dismiss in the district court, GLC repeated its false claims that Johnson violated GLC's chain of command by sending her August 7 email to Nesbitt without first sending it to GLC as one of the two reasons it cited for Johnson's termination.  JA 48.

**B.    District Court Proceedings**

25

On April 27, 2021, the district court granted GLC's motion for summary judgment. JA 1039. In rendering the decision from the bench, the district court found that Johnson's August 7, 2018 email was not protected activity within the meaning of Title VII of the Civil Rights Act of 1964. JA 1049-1050. The district court also found that Johnson did not have sufficient evidence for a reasonable juror to find that her prior protected activity caused GLC to terminate her. JA 1053-1054. Plaintiffs timely appealed. JA 517-18.

## SUMMARY OF ARGUMENT

The district court made two dispositive errors in granting summary judgment. First, the district court found that Johnson's August 7, 2018 email that GLC claims caused GLC to fire Johnson was not Title VII-protected activity. This holding is incorrect for several reasons. First, the plain language of the email expresses Johnson's belief that her potential new supervisor had retaliated against her because she reported sexual harassment and likely would retaliate against her again. This plain language about the fear of retaliation and recounting past retaliation culminating in Johnson's termination from her first period of employment is protected by Title VII.

The context in which the email was sent reinforces this conclusion. Johnson had already been fired after reporting sexual harassment only to be hastily rehired when she filed an EEO complaint. Johnson told GLC management about this EEO

complaint against FSI both prior to and during her second period of employment. Johnson also explained the harassment and retaliation she experienced from FSI employees and expressed fear that she was being subjected to further retaliatory harassment. The context of Johnson's email make it clear that she was complaining about retaliation in violation of Title VII.

Under this Court's law, it does not matter that Johnson's August 7 email reported some misconduct that would not violate Title VII and some misconduct that would. If part of the complaint can be read to be a complaint of conduct that reasonably appears to violate Title VII, the complaint is protected.

The second dispositive error the district court made was finding that Johnson could not establish that her Title VII-protected activity that predated the August 7 email caused her termination as a matter of law. GLC's provision of a myriad of false explanations for Johnson's termination in the administrative processing, discovery and depositions, and motions practice in this case are sufficient evidence of causation to overcome summary judgment. Likewise, GLC's unbelievable reliance on termination bases that it did not investigate are sufficient pretext evidence to preclude summary judgment.

For the following reasons, the district court must be reversed and the matter remanded for trial.

## STANDARD OF REVIEW

The Fourth Circuit "reviews de novo the district court's order granting summary judgment." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 565 n.1 (4th Cir. 2015). "A district court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 568 (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted).

In determining whether a genuine dispute of material fact exists, the Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to . . . the nonmoving party." *Id.* at 565 n.1 (internal quotation marks omitted). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

## ARGUMENT

### I.    The District Court Erred In Finding That Plaintiff's August 7, 2018 Email Was Not Protected Activity.

The district court erred in finding that Plaintiff's August 7, 2018 email was not protected activity within the meaning of Title VII of the Civil Rights Act of

28

1964. To show "protected activity," the plaintiff in a Title VI retaliation case need "only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003). Three important principles govern the evaluation of whether conduct is protected:

First, a plaintiff is not required to use magic words to engage in protected activity. *McNair v. Computer Data Sys., Inc*. 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir. 1999) (stating that no magic words are required to engage in protected activity). Instead, the employer's knowledge of the factual context surrounding the complaint can establish that the employer knew or should have known that the employee was opposing Title VII discrimination or retaliation even if the employee does not explicitly mention those terms. *Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018).

In *Strothers,* for example, the employee complained of harassment and hostile work environment but did not explicitly mention racial discrimination. 895 F.3d at 336. This Court held that the context outside of the complaint was sufficient to inform the employer that the employee was complaining of racial discrimination despite the employee's failure to explicitly mention it because a manager had previously noted that the alleged harasser had wanted to hire someone of a different race. *Id.* The Court found that the manager should have

understood the complaint to refer to harassment based on race without the employee regurgitating what the manager previously told him. *Id.*

Similarly, in *Okoli v. City of Balt.*, an employee's complained of "unethical and unprofessional business characteristics, e.g., *harassment*, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity," without mentioning sexual harassment specifically. 648 F.3d 216, 224 (4th Cir. 2011). Again, this Court found the complaint to be protected activity even though the plaintiff did not use magic words because the language of the complaint, such as the words dehumanizing and degrading, could be read to be related to be a complaint about severe mistreatment based on identity. *Id.* Again, the employee was not required to use magic words.

A second principle governing the evaluation of whether a complaint is protected within the meaning of Title VII is that the employee need only show that they had a reasonable belief that they were opposing violations of Title VII and need not ultimately be able to prove the merits of the underlying discrimination or retaliation. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 356 (4th Cir. 1985) (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of discrimination was in fact meritorious in order to prevail).

30

A third principle governing the evaluation of purported protected activity is that an employee's complaint is protected when he complains of a discriminatory or retaliatory action or hostile work environment that is in progress but has not fully formed into actionable discrimination or retaliation. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015).

*Boyer-Liberto* elaborated on the reasoning for protecting complaints of developing discrimination or retaliation. 786 F.3d at 282-88. This Court noted that in hostile work environment claims employees are compelled by the *Faragher/Ellerth* affirmative defense to notify their employer of actions that make up a hostile work environment or risk that the will not be imputable to the employer. *Id.* 282-83. The Court noted that requiring that an employee wait until a certainly actionable hostile work environment develops would discourage early intervention and discourage harassment victims from speaking up by depriving them of protection from retaliation. *Id.* at 283. This Court held that such a standard is "incompatible with *Crawford* [*v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 279 (2009)] as well as other Supreme Court decisions directing that Title VII's antiretaliation provision be interpreted "to provide broad protection from retaliation." *Boyer-Liberto*, 786 .3d at 283 (internal citations omitted).

A.  Johnson reasonably believed she was opposing retaliation and discrimination
    by Matar in sending her August 7, 2018 email.

Applying these principles, it is apparent that Johnson's August 7, 2018 email
was based on a reasonable belief that she had been subjected to retaliation and
sexual harassment.  With respect to Matar in particular, Johnson stated that Matar
retaliated against her after Johnson had reported a sexual assault to Matar and
insisted that she would report it.  In response, Matar attempted to discourage her
from complaining and then stopped speaking to Johnson entirely and excluded her
from work events.  Johnson described Matar's actions in this regard in the eighth,
ninth, and sixteenth paragraph of her August 7 email.  Johnson further described
how Matar assisted Hickman in harassing Johnson by relaying what Johnson had
told Matar in confidence about her harassment.  Although not explicitly explained
in the email, Johnson also knew that Matar had made derogatory comments about
her to her colleagues after Johnson had told her that Abdelaziz had sexually
harassed and assaulted her.  The facts form a reasonable basis to believe that Matar
was harassing Johnson based on her EEO activity of complaining about sexual
harassment and assault.

Johnson also reasonably believed that other supervisors had subjected her to
retaliatory termination, sexual harassment, and retaliatory harassment.  As she
noted in the ninth paragraph of her email, in her first period of employment she
tried to address the sexual and emotional harassment she experienced and was

32

"fired because of it."  Johnson also reasonably believed she had been sexually

harassed.  Abdelaziz had made inappropriate advances and bit her neck when she

dodged a kiss from him.  Johnson listed this event in fourth and ninth paragraphs

of the August 7 email.  And Johnson reasonably believed she had been subjected to

retaliatory harassment after she reported the sexual assault to Matar, as explained

in the eighth and ninth paragraphs of the email.  In sum, Johnson reasonably

believed she had been retaliated against and sexually harassed and listed these

events in her August 7 email.

B. <u>A reasonable jury could find that GLC understood or should have
understood the complaint to be opposition to Title VII retaliation and
discrimination.</u>

A reasonable jury could find that GLC understood or should have

understood Johnson's August 7 email to be Title VII-protected opposition to Title

VII retaliation.  Starting with the language of the email itself, Johnson's first four

paragraphs identify the problem for which she is seeking aid:

> "Hope this email finds you well. I was away for a while on a great
> vacation, but it's good to be back. I miss being in the classroom with
> my students.
>
> I have heard a rumor that Ms. Tanya Matar is a candidate to replace
> one of our supervisors in the Arabic Department. Unfortunately, I feel
> compelled to put it on the record that I can not work under her
> supervision in good conscience, knowing what I know.
>
> I am compelled to inform you of highly unethical and unprofessional
> behavior on Ms. Matar's part. After that, the ball is in your court, but
> **please understand that I fear retaliation**, and I have had enough of

33

emotional strain, I can no longer go home feeling like I did for the past two years.

**My colleagues and I have been victims of continuous harassment, both sexual and emotional**. We held a focus group in which we specifically asked to not have an Arabic Supervisor in the Arabic section back in June. I went to Mr. Petrosian right before I left on my vacation, expressing concern that Ms. Matar might be eligible to switch to this department and shared information with him about her behavior."

JA 733 (emphasis added). After identifying the problem of Matar supervising her, Johnson went on to list her case for why Matar should not be a supervisor in the Arabic Section. This list included a variety alleged misconduct, some of which would not violate Title VII and some of which would. The structure of the email indicates that the problem is that Johnson is concerned with retaliation based on her reports of sexual harassment and not the list of items that she believed should disqualify Matar from being their supervisor. Accordingly, the plain language of the email demonstrates that Johnson is opposing retaliation in violation of Title VII.

The surrounding events reinforce this conclusion. At the time of the email, GLC knew that Johnson had been fired from her initial period of employment and almost immediately rehired after an EEO investigator contacted GLC. GLC testified that such a rehiring was extremely rare, occurring only once or twice in GLC VP Mitchell's twelve years working with FSI. Based on this, GLC should have known that not only was Johnson alleging discrimination and retaliation

against FSI but that those claims must have had some merit in FSI's view.

Further, Johnson had explained the harassment and retaliation she experienced to GLC management at the time her first period of employment ended, again when she was rehired, and had mentioned her ongoing case several times during her second period of employment. Given this context, and the repeated explicit reference to sexual harassment, retaliation, and the explanation of Matar's role in retaliating against Johnson, GLC understood or should have understood Johnson's complaint about her fear of retaliation to refer to Title VII retaliation. A reasonable factfinder could easily find that GLC knew or should have known that the email was opposing Title VII-retaliation.

C. Johnson's inclusion of Matar's misconduct unrelated to Title VII does not establish as a matter of law that the complaint was not protected.

Finally, the fact that Johnson identified misconduct by Matar that is unrelated to Title VII does not entitle GLC to summary judgment. As explained above, the structure of the email indicates that Johnson identified retaliation for reporting sexual harassment as the problem. Johnson list of a variety of misconduct by Matar was an effort to convince management that Matar should not be made supervisor and not the problem Johnson was primarily addressing.

Regardless, an employee's inclusion of unprotected issues does not foreclose a complaint from being oppositional activity within the meaning of Title VII. *See, e.g., Okoli v. City of Balt.,* 648 F.3d 216, 224 (4th Cir. 2011) (finding that an

35

employee's complaint about dehumanizing and degrading conduct was protected activity despite the employee's simultaneous complaint about "unethical and unprofessional business characteristics," , "mocking and gossiping about other colleagues (anyone in the City government)," and "lack or disregard for integrity.").  Drawing reasonable inferences in favor of Johnson as the nonmoving party, a reasonable jury could find that Johnson was opposing Title VII-retaliation and harassment.

## II.     The District Court Erred In Finding That A Reasonable Jury Could Not Find That Johnson's EEO Activity Outside The August 7, 2018 Email Caused Her Termination.

Independently, even assuming for the sake of argument that Johnson's August 7 email was not protected activity, the district court still erred in granting GLC summary judgment because a reasonable jury could find that Johnson's other oppositional activity and filing of an EEO complaint caused GLC to fire her.

### A. A reasonable jury could find GLC had notice that Johnson repeatedly engaged in protected activity by filing an EEO complaint and reporting discrimination and harassment to Mitchell and Bairatchnyi

A reasonable jury could also find that GLC had knowledge of Johnson's prior EEO activity.  When she was terminated the first time, Johnson complained that FSI employees had subjected her to discrimination and harassment.  Mitchell was aware of Johnson's pending EEO case, as was Bairatchnyi, as demonstrated by emails.  A reasonable jury could also conclude that Johnson informed

36

Bairatchnyi of the discrimination she experienced when she met with him after being rehired.  This too is protected activity.

B. A reasonable jury could find that Johnson has established that GLC terminated her *because* of her protected activity to establish a prima facie case and to preclude summary judgment based on GLC's purported legitimate justifications.

   a. *A reasonable jury could find that GLC's proffered justifications for Johnson's termination are pretext.*

In *Reeves v. Sanderson Plumbing Prods.*, the Supreme Court held that the factfinder's disbelief of an employer's justification for an adverse action is sufficient evidence to permit a jury to find discrimination.  530 U.S. 133, 147 (2000).  Indeed, the Supreme Court noted that such evidence might be "quite persuasive," and that in the event the employer's explanation is shown to be false, "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."  *Id.*

1. GLC's provision of false justifications for Johnson's termination is sufficient evidence of pretext to preclude summary judgment.

As explained above, in responding to an EEO investigator, the EEOC, the district court, and in depositions, GLC maintained that one of the reasons Johnson was terminated was because she violated their chain of command and directives by contacting SLS.  GLC falsely claims these directives were provided to Johnson in writing, however, the documents she actually received state the exact opposite:

37

FSI's policies explicitly authorized instructor to report harassment and discrimination to Dean Nesbitt. GLC's own orientation documents authorized Johnson to take issues to FSI employees. GLC's claims to the EEO investigator, EEOC, and this Court are patently false.

Likewise, documents and testimony establish that GLC fabricated its claim to the EEO investigator that Johnson's unexcused absence lost GLC profit and revenue. GLC had approved Johnson's leave and would not have been paid regardless of her alleged failure to resubmit a second email stating the reason for the leave because GLC is not paid regardless of whether an employee is on PTO or leave without pay. Further, documents also establish that GLC could not have believed another of its explanations that Johnson was refusing to work under a supervisor because her emails expressly disclaimed that.

In addition to GLC's patently false claims, a reasonable jury could also find that GLC did not actually believe that Johnson's conduct embarrassed GLC with FSI. FSI did not inform GLC that it found Johnson's conduct to be inappropriate (and no one in GLC leadership wanted Johnson terminated after she sent her email) and documents demonstrate that GLC knew that Johnson had a personal relationship with Dean Nesbitt. A reasonable jury could also find that GLC did not believe that Johnson's conduct displayed total disregard of professionalism—in fact, in deposition, GLC conceded that Johnson's August 7 email was not

inappropriate had it been sent through the proper chain of command. As explained above, the "proper chain of command," is a fabrication. Additionally, a reasonable jury could find that (a) Johnson did not violate leave policy because Bairatchnyi told her he would take care of it; or (b) even if Johnson misunderstood Bairatchnyi, her failure to send a second email stating the reasons for her leave was not serious enough to warrant discipline.

GLC's repeated and significant misrepresentations regarding its claimed justifications for terminating Johnson is sufficient to preclude summary judgment.[3]

2. GLC's failure to investigate the accuracy of Johnson's report about Matar or determine if FSI was upset by Johnson's email is sufficient evidence of pretext to preclude summary judgment

An employer's claim that it made an uninformed decision in taking an adverse action against an employee is also evidence of pretext. *McCallum v. Archstone Cmtys. LLC*, No. JFM-12-01529, 2013 U.S. Dist. LEXIS 142339, at *47 (D. Md. Oct. 2, 2013) *citing E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846, 853-54 (4th Cir. 2001) (finding evidence of pretext based on employer's admission that she made an uninformed decision before taking adverse employment action).

---

[3] GLC's dropping of the false claim about the leave losing it revenue between the time it spoke with the EEO investigator and submitted a position statement to the EEOC and its dropping of the chain of command claim between its motion to dismiss and motion for summary judgment also evidence pretext. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 576 (4th Cir. 2015) (stating "[t]he fact that an employer has offered different justifications at different times for [an adverse employment action] is, in and of itself, probative of pretext."

Here, GLC failed to investigate (a) whether the concerns Johnson listed about Matar were valid and substantiated or not (b) whether Johnson had gone on "vacation," to Lebanon or to visit her family after the death of a family member and hospitalization of her grandmother; or (c) whether FSI thought Johnson's email was inappropriate. In fact, GLC overlooked the fact that Nesbitt had responded stating that the email reflected trust in Nesbitt's judgment and that Nesbitt had not complained about the email.

This failure to conduct any investigation is especially revealing in Johnson's case, where GLC knew she had a pending case regarding her prior termination and harassment. Further, GLC should have realized the case had some merit as Johnson had been almost immediately returned to work—despite serious allegations by Elsasser—after the investigator spoke with Mitchell and expressed confidence that Johnson would be returned to work. GLC's failure to verify many of the reasons it gave for Johnson's termination also precludes summary judgment.

> b. *GLC's rehiring of Johnson and renewal of her contract in June 2018 do not entitle GLC to summary judgment with respect to Johnson's claim that her additional EEO activity caused her termination.*

GLC's rehiring and renewal of Johnson's contract does not entitle GLC to judgment as a matter of law with respect to Johnson's argument that GLC retaliated against her because of her pre-August 7 EEO activity. While it is true that GLC rehired Johnson despite her earlier EEO case against FSI, this occurred

40

when FSI placed Johnson as the only Arabic instructor on the preference list.  This meant that Johnson was requested to be hired by FSI and it was only a matter of which contractor would be paid for her work.  GLC was only able to profit from Johnson's work if she selected GLC to submit her resume.

Regardless, even if GLC did not have retaliatory animus when GLC rehired her, GLC could have developed that animus when FSI Contract Officer Elsasser contacted GLC and angrily criticized GLC for rehiring Johnson in November 2017.  Indeed, from that point forward GLC seemed to take every opportunity to build a case to fire Johnson.  When Johnson's badge was revoked without explanation in February 2018 and she questioned whether the revocation was retaliatory, Mitchell immediately documented alleged untruthful statements she made in her badge forms.  Mitchell documented this concern even though it was obvious from the 2016 signature on Johnson's badge forms that she inadvertently sent the wrong form.

Further, without weighing credibility in favor of GLC witnesses and drawing reasonable inferences in favor of Johnson, the evidence establishes that GLC attempted to falsely document that Johnson took unauthorized leave in July 2018 even though she had obtained the required approval of both her GLC and FSI supervisors.  And assuming for the sake of argument that the August 7 email was not protected activity, GLC did no investigation into how the email was received

41

by FSI and whether FSI management found it to be troublesome.  Combined with the significant evidence of pretext in this case, this is sufficient evidence of causation for a reasonable jury to find that GLC was motivated to fire Johnson because of her EEO activity beyond the August 7 email.

## CONCLUSION

For the foregoing reasons, the district court's decision dismissing the plaintiffs' claims should be vacated, and remanded for further proceedings on those claims.

Respectfully submitted,

/s/Jack Jarrett
Jack Jarrett
1825 K Street, N.W., Suite 750
Washington, D.C. 20006
T: 202.463.6036
F: 202.463.6067
jack.jarrett@leschtlaw.com
*Counsel for Plaintiff-Appellant*

August 18, 2021

## STATEMENT CONCERNING ORAL ARGUMENT
### (Local Rule 34(a))

Plaintiff respectfully requests oral argument.  This case involves relatively complex factual determinations and Plaintiff believes that oral argument would assist the Court in making a determination on the merits.

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R.

App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New

Roman, a proportionally spaced typeface.

I further certify that this brief complies with the type-volume limitation of

Fed. R. App. 32(a)(7)(B) because it contains 10,384 words according to the count

of Microsoft Word.

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2021, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

The participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

/s/Jack Jarrett_____
Attorney for Plaintiff-Appellant

45